ROBERT AUGUSTUS JONES *v.* STATE
OF MARYLAND

[No. 333, September Term, 1967.]

*Decided July 25, 1968.*

The cause was argued before MURPHY, C. J., and ANDERSON, MORTON, ORTH, and THOMPSON, JJ.

*Tucker R. Dearing* for appellant.

*Alfred J. O'Ferrall, III, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Joseph D. Weiner, State's Attorney for St. Mary's County,* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

Robert Augustus Jones, the appellant, was convicted of assault and battery in the Circuit Court for St. Mary's County, Judge Perry G. Bowen, Jr. presiding with a jury. The court granted a motion to acquit as to a charge of assault with intent to murder, and the jury acquitted as to a charge of larceny. The court imposed an indeterminate sentence of four to six years.

On appeal Jones alleges that the trial court erred in denying his motion for judgment of acquittal as to assault and battery, in permitting Trooper Moore to be called as a witness in violation of an exclusion of witnesses order, and in refusing to strike the jury panel or to remove the case because the jury had been prejudiced.

Jones, while operating his 1956 Chevrolet, was stopped by Trooper Hugh T. Moore of the Maryland State Police at about 11:40 P.M. on May 20, 1967. In the words of the trooper the following occurred:

> "A. I stopped the '56 Chevrolet in the southbound lane of State Route 5, approximately a half mile north of the Half-Way-House on the dual highway. I never approached the car. Mr. Jones got out of his car as I got out of mine and approached me. I asked for his driver's license and registration card and told him that he had been stopped for exceeding 55 miles per hour. I started—Mr. Jones handed me his driver's license and registration card, and I commenced to issue a warning for the offense of exceeding 55 miles per hour. While I was writing the warning, Mr. Jones claimed that he had done nothing. Then a white '55 or '56 Mercury stopped behind my police car. My police car was behind Mr. Jones' vehicle. I said—I ex-

cused myself from Mr. Jones and then approached the operator of the Mercury, and asked if there was anything I could do to help him or offer assistance. And he told me he was waiting for his friend whom I assumed was Mr. Jones. I went back to the right front portion of my police car and continued to write the warning.

This time the man in the Mercury got out and approached. As he approached, Mr. Jones became quite loud, started waiving his arms and shouting at the top of his voice he had done nothing. I asked him to keep quiet and to cease waiving his arms and acting in this manner.

"Q. Officer, you said he was shouting on the top of his voice. Was it loud enough to be heard by the people passing by?

"A. Yes, sir; it was.

"Q. Now, what was the [sic] saying when he was—

"A. At this time, he was continuing to state that he had done nothing wrong. After his friend approached, he got quite loud and appeared to me to be almost violent in his manner—

"MR. DEARING: I object to what he appeared.

"THE COURT: Overruled.

"BY MR. WEINER:

"Q. Go ahead.

"A. At any rate, he was again asked to stop shouting and to calm down. At this time, he was right next to my right side and yelling in my ear at such intensity that I could not understand what he was saying. His arms were waiving in the air, and I cannot testify as to the exact words he said as I did not understand him due to the loudness of his voice and the booming effect.

"I then placed my hand on Mr. Jones' shoulder and placed him under arrest for disorderly conduct. This time, Mr. Jones pulled away from me and said I

needed a warrant to arrest him. I told Mr. Jones a warrant would be issued when we arrived in Leonardtown, and again placed my hand on his shoulder and attempted to place him against the police car for a quick search and placing him in the vehicle and transporting him to Leonardtown. At this time, as I was attempting to pull him toward me to pull him around, his shirt ripped. This action threw me backwards a little bit. Mr. Jones then attacked me. He hit me in the stomach with his shoulder and drove me the length of my police car which is approximately 17 feet. As we were falling to the ground I hit Mr. Jones with my 5-cell flashlight. I was on the bottom and Mr. Jones was on top when we landed on the ground.

"After a struggle for a very short period of time, Mr. Jones managed to remove my revolver from the holster—"

\* \* \*

"Q. What happened after you and Mr. Jones went down on the ground?

"A. As I stated, after a struggle Mr. Jones managed to remove my weapon from the holster. This was the first time that any movement toward the weapon was made was when Mr. Jones made it. He then placed the weapon under my chin and cocked it. After a struggle, I managed to free the weapon by grabbing the barrel and throwing it clear of both Mr. Jones and myself. This time, Mr. Jones grabbed my flashlight and struck me across the forehead.

"Q. Is this the same flashlight that you referred to?

"A. Yes, sir. It apparently fell to the ground near where we were struggling. When I rose from the ground, Mr. Jones was standing I would imagine approximate distance between me and the State Attorney. The weapon pointed at me and cocked, I heard the click as it was cocked, and I saw it with the hammer back. At this time, he was standing between my

car and the '56 Mercury and the lights on the Mercury were on and he was in plain sight. At this time, he took the weapon and started toward me and then swung it with his right hand and struck me across the left side of the head, left temple. The gun went off at this time. He then struck me again with it. He started to leave, grabbed my flashlight and threw it at me. Stating as he was leaving, waiving the gun in the air 'I think I'll keep this for a while,' and then proceeded south in State Route 5 in his car."

As a result of the affray the trooper received a mild concussion, a wound in the forehead which required six stitches to close and numerous scrapes over his body.

Jones testified that as the trooper was writing the warning ticket he said he mumbled to himself "A man can't ride down the road in peace nowadays", and the trooper grabbed him and ripped his sleeve off his shirt, told him to shut up, and when he inquired what he had done wrong the trooper tore his shirt and placed him under arrest for disturbing the peace and hit him in the mouth with the flashlight and that he took the gun from the trooper only after the trooper had drawn it. His story was supported by his friend who was riding in the second car.

Jones contends that the evidence was insufficient to support his conviction because his words of protest against being stopped by the trooper were not sufficient to constitute disorderly conduct and that his arrest was illegal. If we accept the argument that the arrest was illegal the appellant is not helped. The applicable rule was stated in *Sugarman v. State,* 173 Md. 52, 57, 195 A. 2d 324 as follows:

"The authorities seem in accord that one illegally arrested may use any reasonable means to effect his escape, even to the extent of using such force as is reasonably necessary."

The trooper's testimony, which obviously was accepted by the jury as factual, shows that after the trooper was disarmed and Jones had ample opportunity to escape, he returned and struck the officer twice with the pistol. Even where the use of force

is authorized the force employed may not be more than is reasonably demanded by the situation, *Tipton v. State,* 1 Md. App. 556, 232 A. 2d 289. The evidence was clearly sufficient to support the conviction.

Jones next contends that reversible error was committed when Trooper Moore was recalled to the stand to identify his revolver which Jones had taken from him. Jones' position is that Trooper Taylor was permitted to testify in violation of Maryland Rule 753. Under the rule and under *Bulluck v. State,* 219 Md. 67, 148 A. 2d 433 when the exclusion of witnesses is requested, it is mandatory that the trial court comply with the request. In *Swift v. State,* 224 Md. 300, 167 A. 2d 762 the Court found harmless error on that factual situation, and declined to reverse on that ground. In the present appeal Trooper Moore was permitted to stay in the courtroom after he had completed his original testimony. It later appeared that it was necessary for him to identify his revolver before it could be offered into evidence. It seems most unlikely that this testimony was affected in any way by the testimony of the other witnesses which he heard. We, therefore, decline to reverse; the error was harmless. In fact, the officer had already identified the weapon as his when previously on the witness stand and his recall was unnecessary.

Jones made a motion prior to trial that the jury panel be stricken and a subsequent motion that his case be removed to another jurisdiction, both of which were based on the same factual situation. The record shows that during the night prior to the trial someone painted a black swastika on a pillar of the courthouse, had written on the courthouse steps "Shit on you, Nigger". Based on these facts Jones testified that he could not get a fair trial and argued the effect of these actions was to charge the atmosphere with racially impacted prejudices and create an atmosphere of hostility thereby denying him a fair trial. The court examined the jurors on *voir dire.* Each juror admitted that he saw the markings but each juror also stated that he would not be influenced thereby in the disposition of the case. The sheriff testified the markings had been placed there during the night and that it was his opinion that the vandalism had no connection with the case under trial, since

there had been no publicity that the case was to be tried on that particular day and he had reason to believe the markings related to another proceeding. Both motions are matters of discretion in the trial judge and the burden is upon the moving party to show facts which will give rise to the actual prejudice. *Bristow v. State,* 242 Md. 283, 219 A. 2d 33, *Borman v. State,* 1 Md. App. 276, 229 A. 2d 440, *Jones v. State,* 2 Md. App. 429, 234 A. 2d 900. The trial court was satisfied that the jurors could render a fair verdict and we cannot say, on this record, that he abused his discretion, *Dubs v. State,* 2 Md. App. 524, 235 A. 2d 764, *Benton v. State,* 1 Md. App. 647, 232 A. 2d 541.[1] Compare *Jones v. State,* 185 Md. 481, 45 A. 2d 350.

*Judgment affirmed; appellant to pay costs.*

## GLORIA BROWN *v.* STATE OF MARYLAND

[No. 351, September Term, 1967.]

---

1. *Cert. granted* by the Supreme Court of the United States on other grounds, 392 U. S. 925, 88 Sup. Ct. 2297, 20 L. Ed. 2d 1384 (1968).